Harry G. PEARSON, Plaintiff,

v.

**BORDEN METAL PRODUCTS COMPANY, Defendant.**

Civ. A. No. 76-G-0283-S.

United States District Court, N. D. Alabama, S. D.

May 31, 1977.

Robert L. Wiggins, Jr., Bryan, Wiggins & Quinn, Birmingham, Ala., for plaintiff.

Allen Poppleton, James P. Alexander, Bradley, Arant, Rose & White, Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

1. This action has been instituted and maintained under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.[1]

1. By order dated November 29, 1976, the court concluded that plaintiff's claims predicated upon 42 U.S.C. § 1981 were barred by Alabama's one-year statute of limitations.

2. Plaintiff Harry G. Pearson is a Negro citizen of the United States and a resident of Leeds, Alabama. Plaintiff was employed by defendant Borden Metal Products Company ("Borden") at its facilities in Leeds, Alabama, during the period between early 1970 and January 1972. At all times during his employment Harry G. Pearson was employed as an hourly-rated production employee.

3. Defendant Borden is a corporation doing business in the state of Alabama and the city of Leeds. Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b) in that defendant is engaged in an industry affecting commerce and has employed at least fifteen persons at all times material to this action.

4. Defendant Borden Employees Union (which may or may not have been effectively served with process of this action) was the labor organization representing production and maintenance employees of Borden for collective bargaining purposes prior to July 23, 1975. Defendant Borden Employees Union was a labor organization within the meaning of Title VII of the Civil Rights Act of 1964, as amended, in that its membership exceed fifteen persons. Defendant Employees Union never entered an appearance and it was voluntarily dismissed by plaintiff from this action at the commencement of trial.

5. Subsequent to July 23, 1975, production and maintenance employees at Borden have been represented by the United Cement, Lime and Gypsum Workers International Union, AFL-CIO, and its Local Union Number 542. Neither the International Union nor its Local Union were named as defendants, initially or by amendment, in this action.

6. This action arises from the discharge of Harry G. Pearson by defendant on January 18, 1972. Ostensibly, plaintiff was involuntarily terminated from his employment at Borden as a result of his failure, during an absence of at least three consecutive working days, to notify Borden of the reasons for his absence pursuant to a requirement in the then effective collective bargaining agreement.

7. While employed at Borden, plaintiff claims he was subjected to unequal treatment regarding his work activity, denial of transfers and humiliation and harassment, all on account of his race; he also claims he was discriminatorily discharged. Plaintiff's proof at trial was limited to matters pertaining to his discharge and, accordingly, the court considers only issues pertaining to the discharge issue.[2]

8. During the period between 1965 and July 1975, Borden's production and maintenance employees were subject to a requirement, provided in the respective collective bargaining agreements, that production and maintenance employees notify Borden during an absence of three working days or longer. At the time of plaintiff's dismissal that provision, found at Article I, Section 2, Item D, of the contract, provided:

> An employee shall lose all seniority and continuous service credit and he will be terminated for the following reasons:
>
> .  .  .
>
> *     *     *     *     *     *
>
> (D) His absence for three working days without notifying the company. Plaintiff's Exhibit 18 at p. 6.

9. Both prior to 1965 and subsequent to July, 1975, the applicable collective bargaining agreements provided similar three-day notice provisions except that both the current contract and at least one contract prior to 1965 provided that a three-day failure-to-notify discharge might be mitigated in the event the employee concerned had a "justifiable reason acceptable to management" for not informing management of the ab-

---

**2.** Plaintiff raised no issue, except discharge, in his charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC"), and the court limited Title VII issues to those "like and related" to discharge (i. e., temporary or permanent interruptions of employment, disciplinary or otherwise).

sence. Compare Plaintiff's Exhibit 19 and Defendant's Exhibit 66.[3]

10. At all times material to this action it was Borden's policy to encourage its employees to report their absence to the company by telephone as soon as possible in order that Borden might adjust its work schedule. A notice to this effect was posted on a bulletin board, adjacent to the employee time clock, on or about February 2, 1971, during the tenure of plaintiff's employment. See Defendant's Exhibit 3 and Plaintiff's Exhibit 257. Plaintiff either read, or should have read, the notice. Further, although perhaps not required to do so, the court observes that the contractual requirement that employees notify their employer of any absence in excess of three days does not appear to be unreasonable or harsh. It serves an obvious employer need to make adjustments in its schedule and there is no showing that it would have an adverse impact upon employees of one race or another.

11. While Borden expressly discouraged notices of absence transmitted by fellow workers (Defendant's Exhibit 3, paragraph 2), Borden did not refuse notice of an absence transmitted by a co-worker as a matter of policy and, in fact, received and credited such notices.

12. Plaintiff, during January 1972, was employed on the first shift, commencing at 11:30 P.M. and concluding at approximately 7:00 A.M. He was scheduled to work January 12, 13, 14 and 16, 1972, and failed to report for work on any of those days; it is undisputed that he failed to communicate his absence during this period. Whether, in fact, the plaintiff made an effort to notify Borden is a matter disputed by the parties and with respect to which the court will make detailed findings herein.

13. Plaintiff approaches this litigation on a disparate treatment theory. Plaintiff's argument, as appears from his proof,

does not essentially deny the fact that he failed to report his absence during the four-day period in January 1972, but it is predicated on an attempt to demonstrate that similarly-situated white employees were not also terminated, pursuant to the contract rule, in circumstances when they were absent three or more days without notifying Borden.

14. As a first attack, plaintiff relies upon personnel records maintained by Borden which were identified as "absentee calendars" and "lost time summaries." Both of these records were maintained by Borden's payroll clerk, Ms. Peggy Falletta, who worked in an area identified as the "front office." Ms. Falletta was Borden's payroll clerk at all times material to this litigation.

15. The absentee calendar forms were first used, apparently, in 1972; a mimeographed calendar was utilized prior to that date. Employee absences are recorded by Ms. Falletta on the face of the calendar. On the back, at least on the forms in use since 1972, there is, under the heading "Summary of Problems," a listing indicating the date, the number of hours absent, and, at least in some cases, the reason for the absence ("sickness," "jury duty," etc.). Additionally, on some calendars with respect to some absences, there appears the notation "called in" or something similar (see, e. g., "Reported car trouble" on reverse side of Exhibit G attached to Plaintiff's Exhibit 243).

16. Any attempt to rely upon the calendars to demonstrate a pattern and practice of permitting white employees to be absent without properly reporting their absence must fail because calendars, according to the unambiguous evidence, were not utilized to record employee call-ins on any systematic basis. First, the absence records maintained by Ms. Falletta were generated for the purpose of determining sick pay

---

3. The plant manager, in a 1974 affidavit to the EEOC, stated that if something were "drastically wrong" the company would take that into consideration. Plaintiff's Exhibit 257. This is contrary to the plant superintendent's testimony that even good reasons for failing to notify the company did not mitigate the penalty. The plant manager stated at trial that he made a mistake in his affidavit. No evidence was adduced showing that Borden had considered problems in communication as a mitigating circumstance prior to July 23, 1975.

eligibility, and those documents were not utilized by Borden's plant superintendent in conjunction with the administration of the three-day rule, for which he was responsible. Also, the calendars were typically prepared from time cards or absence slips two or three weeks after the week involved and that fact alone suggests that they would be of no utility in the administration of the three-day rule; three-day discharges were generally effectuated contemporaneously with the absence in question.[4]

17. A comparison of absence calendars to plant superintendent's "call-in records" establishes that the calendars, in fact, do not reflect even a majority of those calls reporting employee absence. Compare Plaintiff's Exhibits 15 and 17 with Defendant's Exhibits 10–22. Additionally, in an interview with a representative of the EEOC in 1974, Ms. Falletta stated that she did not always record a call-in on the absentee calendar, but sometimes forwarded the document to the plant superintendent's office. Defendant's Exhibit 1.

18. Plaintiff apparently recognized that the absentee calendars were not adequate, standing alone, to prove disparate racial treatment; accordingly, he made an effort to compare the calendars with the plant superintendent's files on employees which contained various records documenting reports of an absence. A representative from plaintiff's counsel's office reviewed the call-in records and, where a call-in was identified, made an ink circle on the calendars. The inked-in circles attempt to combine the records in the superintendent's file and compare them with the absences recorded on the calendars; thus, where a circle appears on a calendar it demonstrates the plaintiff had found some notation that the employee in question reported in on that date; the absence of the circle shows that plaintiff found no evidence of the employee calling in from an examination of Borden's records.

19. The superintendent's files were initiated at some point in 1973 by Ms. Jane Taylor, an employee in the plant superintendent's office. Prior to that time the plant superintendent made an effort to keep a record of call-ins but had not done so on a regular and routine basis; he testified that many call-in records were not retained.

20. Predictably, the various absentee calendars reflect absences for which there is no circle indicating a call-in. This is particularly so in the sixties and early seventies when records apparently were not routinely retained. Plaintiff seeks to have the court reach the conclusion that where a three-day absence, or greater, appears on an employee calendar and where there is no circle reflecting evidence of a call-in, the employee in question did not advise Borden of his absence and, accordingly, should have been discharged had the three-day rule been applied on a nondiscriminatory basis.

21. The evidence does not support that conclusion. While the present system at Borden should operate so that a written record would be made of every call-in, the telephone calls may have been taken by any number of different people, including six shop foremen, the plant superintendent, plant watchmen, and three or four clerical employees. Additionally, over a long period of time, even had all records been maintained, the court does not expect that this many people would make a record of each call on every occasion. Further, records might not reflect messages relayed by other employees. Indeed, having observed the nature of records made, and recognizing the number of people making them, the court would, indeed, expect that the call-in records would not indicate each and every call over a seven-year period.

22. Plaintiff attempts to rely upon testimony of the plant superintendent, in his deposition, that records are maintained. However, while the plant superintendent did testify that it is the present company policy to maintain a record, he acknowledged the practice "could occasionally

---

4. The evidence indicates that the three-day discharge was effected when the absent employee sought to return to Borden.

miss." Plaintiff's Exhibit 243, p. 5. Mr. Isbell acknowledged in 1974, in an interview with the EEOC investigator, that he could not "guarantee" that a record had been maintained of every employee call reporting an absence. Defendant's Exhibit 9. The court finds that, as a matter of fact, records have not been maintained of every call reporting an employee absence and Borden's inability to produce records of a call-in for every employee who was absent for three days or more and was not discharged, proves nothing in and of itself.

23. Even had Borden's call-in records been complete, or had the absence calendars reflected all the call-ins, there remains a critical factual defect in the proof offered by plaintiff. Plaintiff offered into evidence some 227 employee absentee calendars, or other records reflecting employee lost time. Of these documents, only seven calendars pertained to black employees. See Appendix A to these findings, which is a list of plaintiff's absentee calendar exhibits showing the race and employment status of each employee with respect to whom plaintiff introduced a calendar. Three (Plaintiff's Exhibits 147 and 148) were related to the years 1976 and 1977, subsequent to the change in the three-day rule and, for that reason, have little probative value. In the period 1970–1975 blacks comprised 25 to 30 percent of Borden's production and maintenance work force. The wholly unexplained failure to produce records of a statistically significant number of black employees for the purpose of comparison substantially penalizes the plaintiff's case from an evidentiary basis. Even had Borden's call-in records been complete, the court is unable to make any factual finding of disparate treatment (such that would support a conclusion of racial discrimination in employment) in the absence of the records of an adequate number of black employees to permit intelligent comparison. Only three sets of absentee records of black employees fall within the period 1970–1975. Appropriate

records were available to plaintiff, and the fact that plaintiff apparently elected to omit such records leads the court to suspect that the records of blacks would not have been materially different from those of whites.

24. The court's suspicion is affirmed by an examination of Defendant's Exhibit 70. Defendant's Exhibit 70, according to the testimony, was prepared by comparing the absentee calendars of active Borden employees (selected, according to the testimony, by including those employees whose records plaintiff's representative photocopied) and comparing those calendars with the call-in records in the plant superintendent's files. That exhibit demonstrates, if examined without reference to the testimony, that Borden does not have evidence of telephone reports during absences 24 hours or longer for both white and black employees. In the period between 1970 and July 1975, 13 black employees and 40 white employees had one or more 24-hour absences for which Borden does not have a record of a telephone call.[5] The exhibit also indicates that Borden's call-in records are more complete in recent years, corroborating the testimony of Mr. Isbell. If instances of failure to report in are tabulated for the same period, 132 instances occur involving white employees where the records do not show call-ins, while there are 41 similar instances for black employees. Defendant's Exhibit 70.

An alternative deduction from these records, if examined wholly without reference to the testimony, would be that both white and black employees have been absent for three days without notifying Borden of their absence and have not been discharged; however, the other evidence in the record, particularly by way of testimony, suggests that interpretation is not correct.

25. Harold Isbell, the plant superintendent, who has been responsible for administering the three-day rule at Borden since sometime in 1970 to date, testified that he

5. If the period is extended through the end of 1976, 15 blacks and 52 whites have one or more 24-hour absences without a record of a reporting in. These calculations are based on

Defendant's Exhibit 70, which does not include employee Billy Walters, whose "call-in" records were not located by defendant's paraprofessional who prepared Defendant's Exhibit 70.

was unaware of any Borden employee, white or black, who had been absent for a period of three or more days, and who had not called in, who had not been discharged pursuant to the rule or separated as a "quit without notice." The evidence reflects that the three-day discharge rule is imposed upon those persons who, in fact, are absent for three days without notifying the company and subsequently attempt to return to work. Most persons who simply cease coming to work without any sort of notice are identified as "quits without notice" or simply "quits." In view of the status of the records, there is no satisfactory method to prove to a certainty from the records that notice had not been received during the three-day period and an employee retained.

26. The president of the labor organization now representing employees of Borden, Daryl Jones, testified that he was unaware of any grievances resulting from the administration of the three-day rule under the Gypsum Workers contract. He also testified that he had been an officer in the predecessor union, although without direct responsibility for processing grievances, and that he was unaware of any grievances pertaining to the operation of the three-day rule. He further testified that he knew of no exceptions to the three-day rule, except "shop talk" pertaining to a white employee who was fired for failing to report in within three days and then rehired at a later date.

27. Further, Defendant's Exhibit 25 reflects that in the period from 1970 through July 1975 some 16 persons were discharged pursuant to the three-day rule, and of that number six were white. Plaintiff does not dispute the fact that both blacks and whites have been discharged pursuant to the rule.

28. The only specific case which presents any unusual circumstances is that of a white employee named William S. Dobbs. Mr. Dobbs was discharged effective October 31, 1974, for failing to report to the company while absent for a period of three days

or more. Defendant's Exhibit 23. Some months later, Mr. Dobbs returned to Borden and spoke with the plant superintendent in an effort to recover his job. In the course of that conversation, Mr. Isbell testified, Dobbs informed him that he instructed a friend to telephone Borden and report him off; Mr. Isbell verified this by discussing the matter with Ms. Falletta. Ms. Falletta, according to the plant superintendent, recalled someone telephoning and asking for Dobbs during the period in question; and Mr. Isbell reached the conclusion that an error, attributable either to Borden or to Dobbs' friend, occurred in transmission of the message. Because of the possibility of an error on Borden's part, Mr. Isbell employed Dobbs after the interview, but Dobbs did not retain his accumulated seniority. While Dobbs was terminated pursuant to the rule, there was a rational basis to reinstate Mr. Dobbs contrary, apparently, to Borden's usual practice.

29. There is no competent evidence in the record which would permit the court to find, as a fact, that white employees have been permitted to be absent three or more days without reporting their absence and avoid the discharge penalty. Indeed, the record is clear that both white and black employees were discharged pursuant to the three-day rule and plaintiff's statistical evidence is deficient.

30. While there is no dispute that plaintiff failed to communicate the absence to his employer during the three-day period, there is, as noted, substantial dispute over the opportunities of the plaintiff to report his absence.[6]

31. With respect to his absence commencing on January 12, 1972, plaintiff testified that he attempted to telephone the company and advise them of his absence. Plaintiff, during this period, was under a physician's care for a back injury. Plaintiff's Exhibit 242.

6. Since plaintiff has admitted that he failed to communicate with his employer during an absence of three days or longer, his efforts to communicate with Borden are not relevant, except perhaps for the purpose of comparing plaintiff's individual situation with that of Mr. Dobbs. For that reason, extensive findings are entered pertaining to the plaintiff's account of his alleged efforts to communicate his absence to his employer.

32. Plaintiff testified that he attempted to telephone Borden but was unable to get through to the company because of some unspecified difficulty with the telephone. Service records of the Leeds Telephone Company (Defendant's Exhibit 39) indicate that neither Borden nor persons placing calls to it reported any difficulties with its telephone number during January 12, 13 and 14, 1972.[7]

33. Plaintiff contends that Borden's electric power was interrupted during this period and that its power failure interrupted its telephone service. A power failure may interfere with the operation of a business telephone system to the extent its bell and lights may depend upon a local source of electricity. However, the plant manager testified that Borden had never experienced a power failure of such magnitude or length of time as to send a shift home, and in Mr. Isbell's March 18, 1974, interview with the EEOC he stated he had no recollection of a power failure during this period. Defendant's Exhibit 7.[8]

34. There was no interruption of telephone service at Borden during the period in question of a duration such that plaintiff could not have easily utilized the telephone to inform Borden of his absence.

35. The plaintiff physically presented himself at Borden's plant on Thursday, January 13, 1972, for the purpose of picking up his paycheck from the prior week. The plaintiff admitted to having signed his time card for the week ended January 9, 1972

(Defendant's Exhibit 30), a procedure necessary in order to receive a paycheck for the week in question. Ms. Falletta, the payroll clerk, testified that Pearson personally appeared at the front office, asked for and received his paycheck, and communicated no reason for his absence to anyone at Borden. Plaintiff testified that he was unable to remember when he received the paycheck, but he recognized the signature on the time card as his own.[9]

36. At the trial Pearson testified that he believed that he attempted to telephone Borden only on the first day of his absence, Wednesday.[10] Pearson testified that his initial affidavit (Defendant's Exhibit 26), executed in January 1972, was accurate as far as it described his attempts to notify Borden. In that affidavit he indicated, "I made numerous attempts to get someone to answer the phone by continuously calling." At trial plaintiff testified that this statement had reference to Wednesday, the first day of his absence. Yet, in his second affidavit to the EEOC (Defendant's Exhibit 27) he testified, "I called in to report off on Friday, January 14, 1972, but no one answered the telephone." In his deposition he testified that he thought it was the third day when he tried to call Borden. Defendant's Exhibit 32 at pp. 55 and 56. At the class certification hearing Pearson testified that he attempted to make contact on the third day (Friday).

37. The variations in plaintiff's testimony as to when he tried to call Borden are difficult to explain. However, plaintiff's

7. The records also reflect that no service interruption was reported at either 699–2111 or 699–2811, numbers which were assigned to Borden.

8. The plant manager did testify that a failure with the 440 volt source (which services Borden's mat welding machines) had occurred to send persons home for a short period of time. Plaintiff's Exhibit 98 indicates that power failure is the reason listed for one employee's 3½ hours absence. None of the 31 1972 absence calendars introduced by plaintiff into evidence reflect any evidence of power failure at Borden during January 12–17, 1972.

9. In response to defendant's request to admit facts, plaintiff indicated that his wife picked up his paycheck on Thursday. Defendant's Exhibit 36. In his deposition, Pearson was very

positive that his wife picked up the paycheck and, in fact, testified to that fact twice, the second time in response to a question asking if he was "absolutely certain that his wife picked up his paycheck." See Defendant's Exhibit 32 at p. 58.

10. The date of the attempted communication is not without significance. Had the plaintiff attempted a call on Wednesday and subsequently sent another employee to relay his message, he would have had no reason to discuss his absence when he picked up his paycheck on Thursday, if he reasonably believed that he had transmitted the reason for his absence. Thus, plaintiff had reason to fabricate the date of the alleged call.

reliance upon the supposed limitation of his initial EEOC affidavit are tenuous. The January 1972 affidavit by its terms does not limit plaintiff's call-in efforts to Wednesday, and the subsequent identification as Friday being the day on which plaintiff sought to call in, in his deposition, his second Commission affidavit, and at the class certification hearing, appear to be better supported in the record.

38. Plaintiff testified that he asked a fellow Borden employee, Charles Miller, to report off for him and advise the company that plaintiff would be unable to attend work due to illness. Miller, in an affidavit to the EEOC (Defendant's Exhibit 29), acknowledges that Pearson asked him to transmit the message to Borden and that he forgot to do so. However, Miller also states in his affidavit that he advised Pearson that he forgot to report him off work on Wednesday evening and that he had seen the power company trucks working near Borden. Pearson acknowledged the communication pertaining to the power company trucks, but indicated Miller failed to tell him about "forgetting" to report him off. Pearson testified that he did not learn that Miller failed to report until he reported to work the following week and was discharged.

39. The court finds as fact that plaintiff had ample opportunity to notify Borden of his absence and simply failed to do so by reason of his own inadvertence and disregard for the obligations of his employment. Plaintiff does not contend that he was unaware of his obligation to notify Borden of his absence. Pearson was, in fact, physically present at Borden's plant at a time when he knew or had reason to know that the employee he requested to notify Borden of his absence had failed to do so. In making this finding of fact, the court is relying upon its observations of the witness at trial and the witness' checkered prior testimony with respect to important factual matters now in dispute. Any doubt which the court may have in favor of plaintiff was totally removed when, at the conclusion of the defendant's case, the plaintiff was recalled as a rebuttal witness and he testified, for the first time, to the effect that at his termination interview Ms. Falletta admitted to Borden management that no one was present to answer the telephone on Wednesday, January 12, during normal business hours.[11] The evidence reflects that there would have been 10 or 11 people in this area at a minimum, and it is simply incredible (in the light of the evidence in this record) that all of them were absent for such a substantial length of time as to totally interrupt telephone communications at a business enterprise for an entire day.[12] The court does not credit plaintiff's rebuttal testimony for any purpose.

40. Unlike the situation involving employee William S. Dobbs, there is no suggestion that any employee of Borden with any responsibility for accepting call-ins of absences made a mistake in receiving a communication from Mr. Pearson with respect to his absence. If, in fact, Mr. Miller was asked to communicate with Borden, his failure to do so was his own, not that of defendant, and defendant had no basis to make an accommodation similar to that accorded Dobbs in 1974.[13]

## ADDITIONAL FINDINGS

Though not directly related to the circumstances of plaintiff's individual case,

---

11. In his deposition plaintiff did not identify Ms. Falletta as even present at his exit interview. Defendant's Exhibit 32, pp. 57–58.

12. In its class certification opinion the court commented upon the dramatic turnabout of plaintiff's testimony and indicated that it would hesitate to certify plaintiff as a class representative because of the variations in his testimony. *Pearson v. Borden Met. Prod. Co.*, 14 FEP 644, 647–48 (N.D.Ala.1976). Plaintiff's testimony at trial affirms the court's suspicion with respect to his veracity.

13. In fact Dobbs did suffer the penalty of the rule, for he forfeited his seniority, based on continuous service, and was terminated. Defendant's Exhibit 23. Any variation in practices with respect to Dobbs was not as to his termination but rather the fact that he was reemployed. Unlike Dobbs, plaintiff never sought reemployment at Borden (see Defendant's Exhibit 32 at pp. 20 and 23) and, in fact, testified in his deposition that he did not want to return.

the court makes the following general findings of fact with respect to matters that may evidence defendant's intent, or suggest that defendant's reason for termination may have been pretextual.

41. According to the 1970 Census, blacks represented 28.8 percent of the total population in the Birmingham Standard Metropolitan Statistical Area.

42. As of January 1976 there were 33 black employees and 92 white employees at the Borden Leeds plant. Blacks represented 26.4 percent of Borden's work force.

43. As of January 1974 there were 25 black employees and 72 white employees at the Borden Leeds plant. Blacks represented 25.8 percent of Borden's work force.

44. As of January 1972 there were 30 black employees and 65 white employees at the Borden Leeds plant. Blacks represented 31.6 percent of Borden's work force.

45. As of January 1970 there were 26 black employees and 57 white employees at the Borden Leeds plant. Blacks represented 31.3 percent of Borden's work force.

46. Blacks represented 25.2 percent of the labor force in the Birmingham S.M.S.A. 1975 Annual Average.

47. At all times material to this action, Borden at its Leeds plant has utilized and is utilizing the plant-wide seniority system. Plaintiff's Exhibits 18 and 19.

48. Seniority at Borden is calculated from date of initial employment upon completion of a probationary period.

49. As of January 1, 1976, the average seniority of white employees at Borden was 5.24 years.

50. As of January 1, 1976, the average seniority of black employees at Borden was 4.57 years.

51. As of January 1, 1976, black average seniority at Borden was 87.2 percent of the white average seniority.

52. As of January 1, 1976, the average pay rate of white employees at Borden was $4.18 per hour.

53. As of January 1, 1976, the average pay rate of black employees at Borden was $4.05 per hour.

54. As of January 1, 1976, black average pay rate at Borden was 96.9 percent of the white average pay rate.

55. Seniority bears a direct relationship to the compensation since the senior employee always has the opportunity, if he so elects, to demonstrate proficiency on the higher rated job.

56. At the Borden Leeds plant, the senior bidding employee is selected for trial. That employee receives a trial period which may last as long as thirty (30) days, and if he performs satisfactorily, he is awarded the job; if he does not perform satisfactorily, he is returned to the job from which he bid.

57. Through August 1976 at the Borden Leeds plant, of the 21 total production and maintenance jobs filled by bids, five of those jobs were awarded to successful black bidders. Blacks received 24 percent of the successful bids and consisted of 26.4 percent of the Borden work force.

58. In 1974, at the Borden Leeds plant, of the 85 total production and maintenance jobs filled by bids, 22 of those jobs were awarded to successful black bidders. Blacks received 26 percent of the successful bids and consisted of 25.8 percent of the Borden work force.

59. In 1972, at the Borden Leeds plant, of the 71 total production and maintenance jobs filled by bids, 20 of those jobs were awarded to successful black bidders. Blacks received 28 percent of the successful bids and consisted of 31.6 percent of the Borden work force.

60. In 1970 at the Borden Leeds plant, of the 64 total production and maintenance jobs filled by bids, 29 of those jobs were awarded to successful black bidders. Blacks received 45 percent of the successful bids and consisted of 31.3 percent of the Borden work force.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and the subject matter of this action.

850

2. An employee, alleging that he has been discharged on account of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, must prove, as a part of his *prima facie* case, first, that he is black; second, that he was in fact discharged; and third, that there is a causal connection between his race and his discharge. The third element may be proved either by direct evidence, or more typically by evidence of disparate treatment between the races which would permit a court to draw an inference that the termination was on account of race. At the point the plaintiff satisfies these requirements, it is the defendant's obligation to demonstrate a legitimate, non-discriminatory reason for the discharge. Assuming the employer satisfies his burden, it becomes plaintiff's burden to show that the "legitimate, non-discriminatory reason" was, in fact, a pretext for racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See*, also, *e. g.*, *Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir. 1974); *Winfrey v. General Motors Corp.*, 11 FEP 651 (N.D.Ga.1975). General statistical evidence of an employer's employment practices is due to be considered, especially with respect to whether the employer's articulated reason for discharge was pretextual; however, such evidence is not determinative of the individual case. *McDonnell Douglas Corp. v. Green, supra; Terrell v. Feldstein Co.*, 468 F.2d 910, 911 (5th Cir. 1972).

3. Concomitantly, an employer remains free to terminate an employee, white or black, for whatever reason, absent impermissible racial discrimination (*e. g.*, *Bradford v. Sloan Paper Co.*, 383 F.Supp. 115, 117 (N.D.Ala.1974).

4. Applying the *Green* standards, it is evident that the plaintiff has satisfied the court that he is a member of a protected class (blacks), and that he was involuntarily discharged from his employment by defendant. The court is reluctant to find, however, that the plaintiff has established a *prima facie* case, since the evidence of a racial "connection" between plaintiff's discharge and race is slender at best.

5. The record fails to support a substantial showing of disparate treatment. The evidence establishes that both blacks and whites were terminated pursuant to the three-day rule prior to its modification in July 1975. Ten blacks and six whites were discharged in the period from 1970 through July 1975. While blacks are discharged at a rate which is disproportionate to their representation in the work force, the numbers are such that the court cannot draw any conclusion from them alone, *e. g.*, *Robinson v. City of Dallas*, 514 F.2d 1271 (5th Cir. 1975). Furthermore, there is no competent evidence that a person, white or black, was subject to discharge and was not, in fact, discharged or separated as a "quit without notice" in the event the former employee failed to communicate during an absence of three working days.

6. The legal difficulty with plaintiff's proof is the absence of the essential comparative evidence necessary for this court to reach an inference of disparate treatment predicated on race. Plaintiff's evidence, as noted in the findings of fact, relates almost exclusively to white employees. The court cannot reach a conclusion of discrimination without reasonable evidence pertaining to employees of both races. *See, East v. Romine, Inc.*, 518 F.2d 332 (5th Cir. 1975).

7. The court notes that the plaintiff did introduce evidence that a white employee, William Dobbs, was rehired after having been terminated pursuant to the three-day discharge rule. As a technical matter Dobbs was, in fact, subjected to the penalty of the rule since he was reinstated without seniority. However, Dobbs was reemployed after an unspecified time, and it is evident that as a practical matter the reemployment of discharged persons on a selective basis would be the basis for a finding of disparate treatment. Accordingly, predicated upon the evidence pertaining to William Dobbs, the court concludes that the plaintiff did make a showing of a *prima facie* case (however weak), and the defendant was obligated to come forward with responsive proof.

8. The court finds that the defendant successfully made a satisfactory nonracial explanation of the difference in treatment between Dobbs and plaintiff which the court credits. Defendant was concerned that Dobbs' message may have been evidence of a mistake on the employer's part in the receipt of the message. No comparable evidence was introduced with respect to the plaintiff's discharge, and there is no dispute that plaintiff failed to seek reemployment after his discharge. *See, Pearson v. Borden Met. Prod. Co.*, 14 FEP 644, 647 n. 10 (N.D.Ala.1976).

9. Further, the court concludes as a matter of law that plaintiff has failed to demonstrate that the reason for discharging Mr. Pearson was a pretext in any respect. In reaching its conclusion the court relies upon the fact that employees of both races were discharged pursuant to the rule and upon the fact that there has been no showing that employees of one race or the other were accorded any different treatment with respect to the administration of the rule.

10. In concluding that the plaintiff's discharge was not pretextual, the court specifically takes into account general statistics with respect to racial distribution at Borden.

11. Although the general statistics are not determinative of an individual case, the court does take into account that blacks are represented at Borden Metal Products Company at a percentage which is consistent with their representation in the area work force. Further, the evidence shows that over the recent years blacks have received promotions pursuant to the competitive bidding system in numbers greater or equal to their representation in the work force. Finally, the court notes that blacks, although on the average having slightly less seniority than whites are compensated at a rate, on the average, that is virtually equal to that of white employees. These general statistics would suggest that blacks in fact are treated on a nondiscriminatory basis.

12. The court also notes plaintiff's evidence that blacks are involuntarily terminated at Borden in numbers which exceed their representation in the work force. However, many of the reasons that appear to support these terminations (see Plaintiff's Exhibits 244 and 245) involve somewhat subjective determinations by Borden supervisors different from the demonstrably objective considerations with respect to the administration of the three-day rule (*i. e.*, was the employee in fact absent from Borden for 24 or more working hours and did the employee during the 24 hours communicate to Borden a reason for his absence?). Because of the difference in kind of separations involved, the court is not inclined to view the general evidence with respect to involuntary terminations as especially probative of individual issues in this case. *Cf., Pearson v. Borden Met. Prod. Co., supra*, pp. 646–647.

13. The court has also considered the Determination of the EEOC, Plaintiff's Exhibit 9, and supporting documents from the EEOC's investigative files, following the rule in the Fifth Circuit. *Smith v. Universal Servs., Inc.*, 454 F.2d 154, 158 (5th Cir. 1972); *Peters v. Jefferson Chem. Co.*, 516 F.2d 447, 450–51 (5th Cir. 1975) (*dicta*). While the court has rejected the Commission's conclusion that there is "reasonable cause" to believe the employer unlawfully discharged plaintiff, it observes that the investigative statements and affidavits support the conclusion that no unlawful employment practice has been committed.

14. The court concludes that the plaintiff has failed to prove that his termination was premised on race, in whole or in part, as required by Title VII of the Civil Rights Act of 1964, as amended. Judgment will be entered accordingly.

852

## APPENDIX A

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 1 | C. Porter | B | Inactive | 1971 |
| 2 | R. Porter | B | Inactive | 1971 LTR |
| 3 | F. M. Davis | W | Active | 1974 |
| 4 | C. Harris | W | Active | 1974 |
| 5 | C. Harris | W | Active | 1975 |
| 6 | J. Morgan | W | Active | 1976 |
| 7 | R. Branham | W | Inactive | 1975 |
| 8 | L. J. Cook | B | Inactive | 1976, 1977 |
| 10 | K. Patterson | W | Inactive | 1973 |
| 11 | D. Shoop | W | Active | 1973 |
| 12 | D. Shoop | W | Active | 1970 |
| 13 | D. Shoop | W | Active | 1969 |
| 14 | D. Shoop | W | Active | 1968 |
| 15 | W. R. Jenkins | W | Active | 1974 |
| 16 | W. S. Dobbs | W | Active | 1974 |
| 17 | W. S. Dobbs | W | Active | 1975 |
| 20 | W. S. Dobbs | W | Active | 1976 |
| 21 | W. R. Kerr | W | Active | 1973 |
| 22 | W. R. Kerr | W | Active | 1974 |
| 23 | W. R. Kerr | W | Active | 1975 |
| 24 | W. R. Kerr | W | Active | 1969 |
| 25 | C. Howard | W | Active | 1974 |
| 26 | C. Howard | W | Active | 1973 |
| 27 | C. Howard | W | Active | 1976 |
| 28 | R. Smith | W | Inactive | 1973 |
| 29 | J. Williams | W | Inactive | 1972 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 30 | J. Humphreys | W | Active | 1974 |
| 31 | R. Parker | W | Active | 1973 |
| 32 | M. Isbell | W | Active | 1976 |
| 33 | M. Isbell | W | Active | 1973 |
| 34 | M. Isbell | W | Active | 1975 |
| 35 | M. Isbell | W | Active | 1971 |
| 36 | M. Isbell | W | Active | 1974 |
| 37 | M. Isbell | W | Active | 1972 |
| 38 | M. C. Jones | W | Inactive | 1974 |
| 39 | M. C. Jones | W | Inactive | 1972 |
| 40 | M. C. Jones | W | Inactive | 1973 |
| 41 | J. Kelley | W | Inactive | 1969 |
| 42 | J. Kelley | W | Inactive | 1971 |
| 43 | J. Kelley | W | Inactive | 1970 |
| 44 | J. Kelley | W | Inactive | 1968 |
| 45 | T. Green | W | Inactive | 1970 |
| 46 | T. Green | W | Inactive | 1970-1971 LTR |
| 47 | F. M Davis | W | Active | 1970 |
| 48 | F. M. Davis | W | Active | 1971 |
| 49 | F. M. Davis | W | Active | 1968 |
| 50 | F. M. Davis | W | Active | 1973 |
| 51 | F. M. Davis | W | Active | 1972 |
| 52 | F. M. Davis | W | Active | 1969 |
| 53 | F. M. Davis | W | Active | 1976 |
| 54 | F. W. Davis | W | Inactive | 1970 |
| 55 | F. W. Davis | W | Inactive | 1970-1971 LTR |
| 56 | F. W. Davis | W | Inactive | 1971 |
| 57 | C. Bradley | W | Inactive | 1971 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 58 | C. Bradley | W | Inactive | 1970 |
| 59 | C. Bradley | W | Inactive | 1970-1972 LTR |
| 60 | J. Bagwell | W | Inactive | 1971 |
| 61 | J. Bagwell | W | Inactive | 1969 |
| 62 | J. Pledger | W | Active | 1969 |
| 63 | J. Pledger | W | Active | 1968 |
| 64 | D. Hill | W | Active | 1970 |
| 65 | D. Hill | W | Active | 1968 |
| 66 | D. Hill | W | Active | 1971 |
| 67 | D. Shaw | Unknown | Inactive | 1967 LTR |
| 70 | C. Thompson | Unknown | Inactive | 1968 |
| 71 | J. McLaughlin | W | Inactive | 1970 |
| 72 | J. McLaughlin | W | Inactive | 1964-1969 LTR |
| 73 | L. Harris | Unknown | Inactive | 1969 |
| 74 | L. Harris | Unknown | Inactive | 1968 |
| 75 | L. Harris | Unknown | Inactive | 1961-1967 LTR |
| 76 | L. Harris | Unknown | Inactive | 1968-1969 LTR |
| 77 | R. Holliday | W | Inactive | 1971-1972 LTR |
| 78 | R. Holliday | W | Inactive | 1972 |
| 79 | B. Bowlin | W | Active | 1975 |
| 80 | G. Alexander | W | Active | 1972 LTR |
| 81 | G. Alexander | W | Active | 1974 |
| 83 | J. Reid | B | Inactive | 1975 |
| 84 | J. Lyons | Unknown | Inactive | 1968 |
| 85 | C. Lowe | W | Inactive | 1971 |
| 86 | W. A. McLaughlin | W | Active | 1972 |
| 87 | W. A. McLaughlin | W | Active | 1973 |
| 88 | I. Armstrong | W | Active | 1972 |

## APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 89 | I. Armstrong | W | Active | 1975 |
| 90 | I. Armstrong | W | Active | 1973 |
| 91 | I. Armstrong | W | Active | 1971 |
| 92 | T. Roberson | W | Active | 1968 |
| 93 | T. Roberson | W | Active | 1967-1968 LTR |
| 94 | N. Danner | W | Active | 1974 |
| 95 | N. Danner | W | Active | 1972 |
| 96 | J. K. Smith | W | Active | 1976 |
| 97 | J. K. Smith | W | Active | 1971-1972 LTR |
| 98 | J. K. Smith | W | Active | 1973 |
| 99 | J. K. Smith | W | Active | 1972 |
| 100 | W. G. Pilkington | W | Inactive | 1961-1968 LTR |
| 101 | W. G. Pilkington | W | Inactive | 1969 |
| 102 | W. G. Pilkington | W | Inactive | 1968 |
| 103 | B. R. Walters | W | Active | 1975 |
| 104 | B. R. Walters | W | Active | 1973 |
| 105 | B. R. Walters | W | Active | 1971 |
| 106 | B. R. Walters | W | Active | 1972 |
| 107 | K. Youngblood | W | Active | 1972 |
| 108 | K. Youngblood | W | Active | 1971 |
| 109 | K. Youngblood | W | Active | 1968 |
| 110 | K. Youngblood | W | Active | 1969 |
| 111 | K. Youngblood | W | Active | 1970 |
| 112 | K. Youngblood | W | Active | 1976 |
| 113 | J. Alexander | W | Inactive | 1969-1971 LTR |
| 114 | J. Isbell | W | Active | 1973 |
| 115 | J. Isbell | W | Active | 1974 |
| 116 | J. Isbell | W | Active | 1975 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 117 | J. Isbell | W | Active | 1976 |
| 118 | C. Goodwin | W | Active | 1976 |
| 119 | C. Gragg | W | Active | 1975 |
| 120 | C. Gragg | W | Active | 1976 |
| 121 | C. Gragg | W | Active | 1974 |
| 122 | C. Gragg | W | Active | 1973 |
| 123 | C. Gragg | W | Active | 1972 |
| 124 | C. Gragg | W | Active | 1971 |
| 125 | C. Gragg | W | Active | 1968 |
| 126 | L. J. Thrasher | W | Inactive | 1971 |
| 127 | L. J. Thrasher | W | Inactive | 1970 |
| 128 | H. Sexton | W | Inactive | 1972 |
| 129 | H. Sexton | W | Inactive | 1973 |
| 130 | R. Stone | W | Active | 1974 |
| 131 | D. Sanders | W | Inactive | 1970 |
| 133 | D. Spratlin | Unknown | Inactive | 1974 |
| 134 | C. Patterson | W | Inactive | 1976 |
| 135 | C. Patterson | W | Inactive | 1975 |
| 136 | J. O'Barr | W | Active | 1973 |
| 137 | J. O'Barr | W | Active | 1972 |
| 138 | J. O'Barr | W | Active | 1971 |
| 142 | D. Patterson | W | Inactive | 1969 |
| 143 | D. Patterson | W | Inactive | 1970 |
| 144 | B. Alexander | W | Active | 1974 |
| 145 | B. Alexander | W | Active | 1972 |
| 146 | B. Alexander | W | Active | 1971-1972 LTR |
| 147 | L. Anderson | B | Active | 1976 |
| 148 | J. E. Armstrong | W | Inactive | 1961-1972 LTR |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 149 | J. Alexander | W | Inactive | 1972 |
| 150 | T. Branham | W | Active | 1975 |
| 151 | H. Bierley | W | Inactive | 1964-1969 LTR |
| 152 | H. Bierley | W | Inactive | 1969 |
| 153 | H. Bierley | W | Inactive | 1968 |
| 154 | B. Brasher | W | Inactive | 1974 |
| 155 | J. Blankenship | W | Inactive | 1974 |
| 156 | J. Blankenship | W | Inactive | 1972 LTR |
| 157 | J. Blankenship | W | Inactive | 1973 |
| 158 | L. Brasher | W | Active | 1975 |
| 159 | L. Brasher | W | Active | 1974 |
| 160 | J. Brasher | W | Inactive | 1976 |
| 161 | J. Brasher | W | Inactive | 1971 |
| 162 | F. Brasher | W | Active | 1975 |
| 163 | L. Bowlen | W | Active | 1973 |
| 164 | N. Barnes | W | Active | 1972 |
| 165 | N. Barnes | W | Active | 1966-1972 LTR |
| 166 | N. Barnes | W | Active | 1969 |
| 167 | O. Byers | W | Active | 1972 |
| 168 | O. Byers | W | Active | 1974 |
| 169 | O. Byers | W | Active | 1971 |
| 170 | O. Byers | W | Active | 1968 |
| 171 | O. Byers | W | Active | 1970 |
| 172 | E. Byers | W | Active | 1971 |
| 173 | B. R. Bosworth | W | Inactive | 1968 |
| 174 | B. R. Bosworth | W | Inactive | 1972 |
| 175 | B. R. Bosworth | W | Inactive | 1961-1972 LTR |
| 176 | B. J. Cambron | W | Inactive | 1970 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 177 | B. J. Cambron | W | Inactive | 1970-1971 LTR |
| 178 | B. J. Cambron | W | Inactive | 1971 |
| 179 | B. J. Cambron | W | Inactive | 1972 |
| 180 | W. Cook | W | Active | 1975 |
| 182 | L. M. Crumpton | W | Inactive | 1972 |
| 183 | L. M. Crumpton | W | Inactive | 1969 |
| 184 | L. M. Crumpton | W | Inactive | 1970 |
| 185 | T. Cook | W | Active | 1975 |
| 186 | T. Cook | W | Active | 1974 |
| 187 | T. Cook | W | Active | 1973 |
| 188 | T. Cook | W | Active | 1972 |
| 189 | T. Cook | W | Active | 1971 |
| 190 | T. Cook | W | Active | 1970 |
| 191 | R. Hardick | Unknown | Inactive | 1967 LTR |
| 192 | J. Howard | W | Active | 1973 |
| 193 | J. Howard | W | Active | 1972 |
| 194 | J. Howard | W | Active | 1970 |
| 195 | J. Howard | W | Active | 1969 |
| 196 | J. Howard | W | Active | 1968 |
| 197 | R. Howard | W | Active | 1975 |
| 198 | R. Howard | W | Active | 1970 |
| 199 | R. Howard | W | Active | 1969 |
| 200 | B. J. Howard | W | Active | 1975 |
| 201 | B. J. Howard | W | Active | 1973 |
| 202 | E. Howard | W | Active | 1976 |
| 203 | C. D. Nichols | W | Active | 1972 |
| 204 | E. Marhburn | W | Inactive | 1973 |
| 205 | T. Martin | W | Inactive | 1968 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 206 | H. McMahon | Unknown | Inactive | 1961-1967 LTR |
| 207 | J. Meadows | W | Inactive | 1972 |
| 208 | G. McGuire | W | Active | 1974 |
| 209 | G. McGuire | W | Active | 1969 |
| 210 | P. Mealer | W | Active | 1976 |
| 211 | P. Mealer | W | Active | 1972 |
| 212 | D. Isbell | W | Active | 1972 |
| 213 | C. Isbell | W | Active | 1968 |
| 214 | G. McGuire | W | Active | 1975 |
| 215 | D. Isbell | W | Active | 1971 |
| 216 | C. Isbell | W | Active | 1971 |
| 217 | C. Isbell | W | Active | 1972 |
| 218 | C. Isbell | W | Active | 1969 |
| 219 | D. Isbell | W | Active | 1975 |
| 220 | L. Thornburg | W | Inactive | 1975 |
| 221 | L. Thornburg | W | Inactive | 1973 |
| 222 | R. Taylor | W | Inactive | 1973 |
| 223 | P. Thornburg | W | Inactive | 1975 |
| 224 | D. Thornburg | W | Inactive | 1974 |
| 225 | P. Thornburg | W | Inactive | 1972 |
| 226 | N. Danner | W | Active | 1975 |
| 227 | A. Parsons | Unknown | Inactive | 1961-1965 LTR |
| 228 | H. Williams | W | Active | 1976 |
| 229 | E. Bice | W. | Active | 1975 |
| 230 | C. Wydemon | W | Active | 1972-1975 |
| 231 | J. Wright | Unknown | Inactive | 1967 LTR |
| 232 | G. Wright | W | Inactive | 1974 |
| 233 | R. Parker | W | Active | 1976 |

APPENDIX A—Continued

| Plaintiff Exhibit | Employee Name | Employee Race | Employment Status | Date of Absentee Calendar |
|---|---|---|---|---|
| 234 | R. E. Rose | Unknown | Inactive | 1966 LTR |
| 235 | H. Thomas | Unknown | Inactive | 1976 |
| 239 | W. D. Walker | W | Active | 1973 |
| 240 | W. D. Walker | W | Active | 1971 |
| 241 | H. Pearson | B | Inactive | 1972 |

<u>Unknown</u>  It is impossible to identify the race of these employees from the exhibits offered into evidence.
<u>LTR</u>  Lost Time Record.  All other dates correspond to Absentee Calendars and Sick Leave Records.

**ARMSTRONG CORK COMPANY,**
Plaintiff,

v.

**ARMSTRONG PLASTIC COVERS COM-PANY, Armstrong Plastic Covers Company II, Armstrong Slip Covers Company, Joe Salerno, Frank Salerno, James Salerno, and Michael Salerno, Defendants.**

No. 75–2C(3).

United States District Court,
E. D. Missouri, E. D.

May 31, 1977.

